**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 17, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LINDA MACCAGNAN,

     Plaintiff - Appellant,

v.

CHERRY CREEK SCHOOL DISTRICT
NO. 5; SCOTT SIEGFRIED; JENNIFER
PERRY; BRENDA SMITH; KELLY
BATES; ANNE EGAN; KAREN FISHER;
ANGELA GARLAND; JANICE
MCDONALD,

    Defendants - Appellees.

No. 25-1335

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:22-CV-00503-CMA-KAS)**
_____

Patricia S. Bangert, Attorney at Law, LLC, Denver, Colorado for Plaintiff-Appellant

Holly E. Ortiz and Mary B. Gray, Semple, Farrington, Everall & Case, P.C., Denver, Colorado for Defendants-Appellees
_____

Before **HARTZ**, **MATHESON**, and **MORITZ**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

Linda Maccagnan sued Cherry Creek School District No. 5 ("Cherry Creek" or the "School District") and others for demoting her from principal to assistant principal. She alleged various federal constitutional and statutory violations. The district court granted partial summary judgment against her. The remaining claims proceeded to trial. After Ms. Maccagnan rested her case, the court granted the Defendants' motion for judgment as a matter of law ("JMOL") under Federal Rule of Civil Procedure 50(a).

Ms. Maccagnan appeals the partial summary judgment, evidence rulings at trial, and the JMOL. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

We provide the following factual and procedural history and later add details as needed for the issues on appeal.

### A.    *Factual History*[1]

### 1.    Ms. Maccagnan's Employment with Cherry Creek

Ms. Maccagnan started working for Cherry Creek as a teacher in 1996. From 1998 to 2014, she held various administrative positions, including assistant principal. In 2014, she became the principal at Challenge School. She received positive

---

[1] The facts come from the trial evidence. *See Dupree v. Younger*, 598 U.S. 729, 734 (2023) ("Fact-dependent rulings must be appraised in light of the complete trial record."); *Valdez v. Macdonald*, 66 F.4th 796, 807 & n.2 (10th Cir. 2023) (providing "factual summary" in appeal challenging rulings at various procedural stages "based on the evidence presented at trial").

performance evaluations—"highly effective"—during her time there. Aplt. App., Vol. 7 at 1738-41.

## 2.  High Plains Elementary School

In 2018, Ms. Maccagnan became principal at High Plains Elementary School ("High Plains"). Her direct supervisor was Dr. Diana Roybal, Cherry Creek's Executive Director of Elementary Education. Dr. Roybal reported to Dr. Jennifer Perry, the Deputy Superintendent of Educational Operations, who reported to Dr. Scott Seigfried, the Superintendent.

Ms. Maccagnan experienced no significant issues during her first year at High Plains, again receiving a "highly effective" performance evaluation. *Id.* at 1746. But early in her second year, Dr. Roybal and Dr. Seigfried received complaints about Ms. Maccagnan from staff and parents.[2] The complaints intensified throughout the year.

### a.  Teachers' union Listening Tour

In December 2019, the Cherry Creek Education Association ("CCEA"), the teachers' union, conducted a "Listening Tour" requested by High Plains staff. Aplt. App., Vol. 10 at 2462.[3] CCEA representatives met with 65 staff members. The School District was not directly involved but received a written summary from the

---

[2] By "staff," we include the teachers and other personnel at High Plains.

[3] CCEA conducted the Listening Tour "in coordination with Front Range UniServ Unit and Colorado Education Association." Aplt. App., Vol. 10 at 2462.

3

CCEA. The summary contained a list of concerns, such as division amongst the staff, negativity in the school, lack of relationships between staff and Ms. Maccagnan, lack of sincerity or support, micromanagement, and fear of retaliation. *See id.* at 2462-63.

On January 28, 2020, Ms. Maccagnan received the written summary. The next day, she met with Dr. Roybal and a human resources representative to discuss the results. She expressed frustration with the summary's lack of context or specifics and felt positive comments about her were not included. They proceeded to discuss plans for improving her relationships with the staff.

b.    *Complaints and grievance*

In February and early March 2020, Dr. Roybal received staff complaints about lack of communication and support from Ms. Maccagnan. On February 19, a teacher filed a grievance alleging that Ms. Maccagnan failed to communicate protocols for student safety and had not addressed a student's dangerous physical behavior. Ms. Maccagnan explained her actions to Dr. Roybal and was told she was adequately handling these issues.

On March 3, 2020, Ms. Maccagnan met with Dr. Roybal and Dr. Perry. Dr. Perry proposed that Ms. Maccagnan leave her position as principal to serve as a School District administrator or an assistant principal at another school. Ms. Maccagnan refused.

4

*c.    Dr. Roybal's interviews*

On March 11 and 13, 2020, Dr. Roybal met with High Plains staff.  Her notes from the meetings reflected critical and negative comments about Ms. Maccagnan, such as a lack of trust, poor communication, a fear of retaliation, feeling judged, and a lack of accessibility.  *See* Aplt. App., Vol. 10 at 2517-30.  Dr. Roybal shared her notes with Ms. Maccagnan on April 7, 2020.

*d.    Demotion*

Sometime in April 2020, Dr. Roybal provided Dr. Perry with a packet of information about Ms. Maccagnan, including parent complaints, grievances, the Listening Tour summary, and her staff meeting notes.  She recommended Ms. Maccagnan's demotion to assistant principal.  Dr. Perry brought that information and recommendation to Dr. Seigfried.  After reviewing the materials, Dr. Seigfried decided to demote Ms. Maccagnan.

On April 16, Dr. Roybal, Dr. Perry, Brenda Smith, Cherry Creek's Chief Human Resource Officer, and Sonja McKenzie, Cherry Creek's general counsel, met with Ms. Maccagnan and her legal counsel.  They said she would be demoted to assistant principal the following school year because of "loss of confidence of staff." Aplt. App, Vol. 8 at 1800.  Her demotion did not involve disciplinary issues or misconduct.

### 3.   Altitude Elementary and Retirement

Cherry Creek assigned Ms. Maccagnan to be the assistant principal at Altitude Elementary School for the 2020 to 2021 school year.  In August 2020, she took leave under the Family Medical Leave Act.  In February 2021, she retired through Cherry Creek's early separation program.

### B.   *Procedural History*

Ms. Maccagnan sued Cherry Creek, Dr. Seigfried, Dr. Perry, Ms. Smith, and members of the Cherry Creek Board of Education,[4] alleging violations of her rights under (1) the Fourteenth Amendment Due Process Clause, (2) the First Amendment, (3) the Fourteenth Amendment Equal Protection Clause, (4) the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and (5) Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681(a).  Ms. Maccagnan brought the first three claims under 42 U.S.C. § 1983.

Ms. Maccagnan alleged the first four claims against all of the Defendants and the Title IX claim against only Cherry Creek.[5]  She sued the individual defendants in

---

[4] Kelly Bates, Anne Egan, Angela Garland, Janice McDonald, and Karen Fisher were the named defendants from Cherry Creek's Board of Education, hereinafter the "Board members."

[5] Like the district court, we treat the School District and the Board of Education "as a single entity," Aplt. App., Vol. 7 at 1595 n.1, and refer to them together as "Cherry Creek."

their individual and official capacities.[6]  The claims included multiple theories of

liability.[7]

| | CLAIM | THEORY | DEFENDANTS |
|---|---|---|---|
| **1.** | Fourteenth Amendment due process violation under § 1983 | Demotion without a hearing<br>Deprivation of salary<br>Defamation | All Defendants |
| **2.** | First Amendment violation under § 1983 | Retaliation | All Defendants |
| **3.** | Fourteenth Amendment equal protection violation under § 1983 | Disparate treatment<br>Hostile work environment<br>Unequal pay | All Defendants |
| **4.** | Equal Pay Act | Unequal pay | All Defendants |
| **5.** | Title IX | Disparate treatment<br>Hostile work environment<br>Unequal pay<br>Stereotyping<br>Retaliation | Cherry Creek |

---

[6] Ms. Maccagnan's official capacity claims against the Board members amount to claims against the School District.  *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Sawyers v. Norton*, 962 F.3d 1270, 1278 n.4 (10th Cir. 2020) ("Official capacity suits impose liability on the entity that the sued public servant represents." (brackets and quotations omitted)).

[7] We identify the theories as alleged in Ms. Maccagnan's complaint regardless of whether they are cognizable violations of the asserted constitutional and statutory rights.

Defendants sought summary judgment on all claims. Ms. Maccagnan sought summary judgment solely on her procedural due process claim. The district court denied Ms. Maccagnan's motion and granted in part and denied in part Defendants' motion. *See Maccagnan v. Cherry Creek Sch. Dist.,* No. 22-cv-00503, 2024 WL 6822017, at *27 (D. Colo. Sep. 30, 2024).

The court granted summary judgment to all Defendants on the due process, First Amendment, and EPA claims. On the equal protection and Title IX claims, the court granted summary judgment in part and denied it in part.

On equal protection, the court granted summary judgment to all Defendants on the hostile work environment and unequal pay theories. On the disparate-treatment theory, it granted summary judgment to (1) Cherry Creek[8] and (2) the Board members in their individual capacities based on qualified immunity. But it denied summary judgment to the individual defendants—Dr. Seigfried, Dr. Perry, and Ms. Smith.

On the Title IX claim against Cherry Creek, the court granted summary judgment on the hostile work environment, unequal pay, and retaliation theories but denied it on the disparate treatment and stereotyping theories.

---

[8] The parties dispute whether the district court granted summary judgment to Cherry Creek in its written opinion or later at the pretrial conference. We address that dispute below.

In sum, Ms. Maccagnan's (1) § 1983 equal-protection claim against Dr. Siegfried, Dr. Perry, and Ms. Smith based on disparate treatment and (2) her Title IX claim against Cherry Creek based on disparate treatment and stereotyping survived summary judgment.

| | CLAIM | THEORY | DEFENDANTS |
|---|---|---|---|
| 1. | Fourteenth Amendment equal protection violation under § 1983 | Disparate treatment | Dr. Seigfried, Dr. Perry, and Ms. Smith |
| 2. | Title IX | Disparate treatment Stereotyping | Cherry Creek |

At trial, Ms. Maccagnan testified in her case-in-chief and called eight witnesses—Dr. Seigfried, Dr. Perry, and Ms. Smith, other current or former Cherry Creek employees, and her psychotherapist. After Ms. Maccagnan rested her case, Defendants moved for JMOL under Rule 50(a). The district court granted the motion on both the equal protection and Title IX claims, stating that "no reasonable jury could conclude, based on this evidence and considering the evidence as a whole, that sex or gender was a motivating factor in the demotion of Ms. Maccagnan." Aplt. App., Vol. 10 at 2355-56.

Ms. Maccagnan appeals the summary judgment on her procedural due process, EPA, and equal protection claims; evidentiary rulings at trial; and the JMOL.

## II.  DISCUSSION

### A.  *Summary Judgment*

"We review the district court's summary judgment decision de novo," applying the same standards as a district court should apply.  *Iweha v. Kansas*, 121 F.4th 1208, 1220 (10th Cir. 2024) (quoting *Klein v. Roe*, 76 F.4th 1020, 1028 (10th Cir. 2023)).

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We view the facts in the light most favorable to the non-movant, resolving all factual disputes and reasonable inferences in their favor.  *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013).[9]

### 1.  Procedural Due Process

One of Ms. Maccagnan's theories under her Fourteenth Amendment due process claim was that Defendants violated her right to procedural due process when they demoted her without a hearing.[10]  In granting summary judgment to all

---

[9] We draw additional facts from the evidence presented to the district court at summary judgment.  *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) ("[We] review from the perspective of the district court at the time it made its [summary judgment] ruling, ordinarily limiting our review to materials adequately brought to the attention of the district court by the parties.").

[10] Ms. Maccagnan alleged other due process violations in her complaint—salary deprivation and defamation affecting future employment opportunities.  The district court granted summary judgment on those theories because Ms. Maccagnan failed to respond

Defendants on this theory, the district court concluded that she lacked a due process

property interest in continued employment as principal of High Plains.  We agree and

affirm.

a.  *Legal background*

"Procedural due process imposes constraints on governmental decisions which

deprive individuals of liberty or property interests within the meaning of the Due

Process Clause of the . . . Fourteenth Amendment."  *Mathews v. Eldridge*, 424 U.S.

319, 332 (1976) (quotations omitted).  "To assess whether an individual was denied

procedural due process, courts must engage in a two-step inquiry: (1) did the

individual possess a protected interest such that the due process protections were

applicable; and, if so, then (2) was the individual afforded an appropriate level of

process?"  *Stepp v. Lockhart*, 168 F.4th 1286, 1302-03 (10th Cir. 2026) (quoting

*Merrifield v. Bd. of Cnty. Comm'rs*, 654 F.3d 1073, 1078 (10th Cir. 2011)).

We look to state law to determine whether an individual has a protected

property interest in employment.  *Washington v. Unified Gov't*, 847 F.3d 1192, 1201

(10th Cir. 2017).  A public employee has a property interest in continued

employment when an "independent source, such as state law, contract, or other

understandings" creates a sufficient expectancy of continued employment.  *Eisenhour*

---

to Defendants' arguments.  *Maccagnan*, 2024 WL 6822017, at *15.  She does not
challenge that disposition on appeal.

*v. Weber County*, 744 F.3d 1220, 1232 (10th Cir. 2014); *McDonald v. Wise*, 769 F.3d 1202, 1210 (10th Cir. 2014). State statutes or regulations create an expectancy of continued employment by "plac[ing] substantive restrictions on a government actor's ability to make personnel decisions.'" *Roberts v. Winder*, 16 F.4th 1367, 1376 (10th Cir. 2021) (quotations omitted). An expectation of continued employment may also exist where "an employee has tenure, a contract for a fixed term, an implied promise of continued employment, or if state law allows dismissals only for cause or its equivalent." *McDonald*, 769 F.3d at 1210-11 (alterations and quotations omitted).

    b.   *Additional factual background*

       Cherry Creek employed principals, including Ms. Maccagnan, through one-year contracts that ran from July 1 to June 30.

       Ms. Maccagnan and other administrators said they expected their employment to continue year-to-year. Ms. Maccagnan stated that she "never had to reapply to maintain the current position [she] had," and there "was never a conversation . . . about whether [she] would receive a contract for the following year." Aplt. App., Vol. 5 at 1096. Instead, the "contracts were simply mailed or emailed to us with instructions to sign and return." *Id.*

       Two other administrators made similar statements in sworn declarations. Alicia Pray, an assistant principal, "understood that administrators had one-year contracts," but her "experience with the district was that [her] role continued year-to-year," and she "never had a discussion" with her supervisor or the superintendent

12

"about [her] position not continuing from one year to the next." *Id.* at 1102.

Christie Toliver, a former principal, stated that she "felt extremely secure that [her]

employment was a given" and, "unless [she] made an egregious error, [she] was not

worried about getting a contract from year to year." *Id.* at 1104.[11]

Ms. Bates, a Board member, confirmed in her deposition that "very few

administrators" failed to receive a contract for the following year. Aplt. App., Vol. 3

at 610.

   c.   *Analysis*

Ms. Maccagnan argues the district court erred in granting summary judgment

because state law or Cherry Creek's practice of renewing principals' contracts

created a protected due process property interest. Aplt. Br. at 23-25. Neither does

so. *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) ("Although

the underlying substantive interest is created by an independent source such as state

law, federal constitutional law determines whether that interest rises to the level of a

legitimate claim of entitlement protected by the Due Process Clause." (quotations

omitted)).

---

[11] A third administrator, Stacey Brandon, stated that she "was never told that [her] position was year to year" and believed her employment was indefinite. Aplt. App., Vol. 5 at 1099. Ms. Brandon was "a member of Central Administration," not a principal or assistant principal, and the record does not reveal whether she was employed under one-year contracts like principals. *Id.*

i.    State law - TECDA

For state law, Ms. Maccagnan points to the Teacher Employment,

Compensation, and Dismissal Act ("TECDA"), Colo. Rev. Stat. § 22-63-202(2)(b)(I).

But TECDA does not establish Ms. Maccagnan's asserted property interest.

Although it requires certain procedures for the nonrenewal of teachers' contracts, *see*

Colo. Rev. Stat. §§ 22-63-202(2)(c.5), 22-63-203, those provisions do not establish a

property interest in a particular position or salary.  *See Johnson v. Sch. Dist. No. 1*,

413 P.3d 711, 718 (Colo. 2018) ("[A] nonprobationary teacher who is placed on

unpaid leave under [TECDA] is not deprived of a state property interest."); *Stanczyk*

*v. Poudre Sch. Dist. R-1*, 490 P.3d 582, 597-98 (Colo. App. 2020) (explaining

TECDA eliminated the "expectancy" in "a position of employment as a teacher").

Nor do they apply to principals.  *See Heutzenroeder v. Mesa Cnty. Valley Sch. Dist.*

*51*, 391 F. App'x. 688, 692 (10th Cir. 2010) (unpublished) ("It is well-settled that

these statutory provisions do not provide tenure or other similar protections for

principals and other administrators.");[12] *Draper v. Sch. Dist. No. 1*, 486 P.2d 1048,

1049 (Colo. 1971) (holding TETDA, TECDA's predecessor, "does not give anyone

holding an administrative position tenure in such a position").[13]

---

[12] Unpublished cases are not binding precedent, but we may consider them for their persuasive value.  *See* Fed. R. App. 32.1(a); 10th Cir. R. 32.1(A).

[13] Ms. Maccagnan cites Colo. Rev. Stat. § 22-63-202(2)(b)(ii), which provides that a "teacher or chief administrative officer [who] intends to terminate his or her employment contract for the current academic year . . . shall give written notice to the

14

ii.    <u>Implied promise</u>

Ms. Maccagnan's alleged expectation based on Cherry Creek's past practice is not an implied promise of continued employment. Although "a clearly implied promise of continued employment" may establish a due process property interest, a "unilateral expectation" of continued employment or "abstract need or desire for it" is insufficient. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). The employee must show that a rule, policy, or mutually explicit understanding created a "legitimate claim of entitlement" to continued employment. *Id.* As the Colorado Supreme Court said, "A terminated Colorado public employee may state a claim for relief for deprivation of property without due process of law if rules or mutually explicit understandings . . . create a sufficient expectancy of continued employment to give the employee a legitimate claim of entitlement." *Adams Cnty. School Dist. No. 50 v. Dickey*, 791 P.2d 688, 693 (Colo. 1990) (en banc). Ms. Maccagnan failed to make that showing.

Ms. Maccagnan does not identify any Cherry Creek rule or policy establishing a legitimate claim to re-employment. Cherry Creek's policies lack "substantive restrictions on the discretion to demote an employee." *Roberts*, 16 F.4th at 1378

---

board of his or her intent at least thirty days prior to the date that the teacher or chief administrative officer intends to stop performing the services required by the employment contract." But this provision restricts how teachers or principals end their employment. It imposes no limit on a school district's ability to terminate.

(quoting *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1254 (10th Cir. 1998)).  The

Administrator's 2017-18 School Year Board of Education Policies and Negotiated

Agreement (the "Administrator's Agreement"), which lists the policies for

administrative personnel, states that "[a]ll employment decisions remain within the

sole and continuing discretion of the Board of Education, subject only to the

conditions and limitations prescribed by Colorado law."  Aplt. App., Vol. 4 at 758.[14]

Nor does the evidence indicate a mutually explicit understanding of continued

employment.  "[A]greements implied from . . . words and conduct in light of the

surrounding circumstances could be independent sources of property interests,"

*Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 222 n.7 (1985), but a property

interest "cannot be inferred from a consistent practice" alone, *id.* at 223 n.9; *see also*

*Darr v. Town of Telluride*, 495 F.3d 1243, 1253 (10th Cir. 2007) (holding "conduct"

may create a disputed fact as to whether "mutual understandings created a property

interest" but past practice is insufficient).

In *Brown v. Independent School District No. I-06*, 974 F.2d 1237 (10th Cir.

1992), we held that "[i]n the absence of a statutory or contractual right to renewal, a

person employed under consecutive annual contracts ordinarily can claim no property

---

[14] In district court, Ms. Maccagnan relied on the Administrator's Agreement as an independent basis for her property interest.  She attempts to revive this argument in her reply brief, *see* Aplt. Reply Br. at 7-8, but she waived it by not raising it in her opening brief.  *See Iweha,* 121 F.4th at 1232.

interest in the indefinite renewal of his or her contract." *Id.* at 1239. The *Brown* plaintiffs thus could not "rely upon the six successive renewals of their employment contracts as evidence of the existence of a property right." *Id.* Ms. Maccagnan's subjective expectation based on Cherry Creek's past practice of offering new contracts similarly fails. *See Heutzenroeder*, 391 F. App'x at 692 (holding evidence of an "alleged custom," based on "subjective belief," "does not establish a mutual understanding creating an entitlement to future employment, nor does it demonstrate a clearly implied promise of future employment" under Colorado law).

Neither TECDA nor Cherry Creek's practice of offering new year-to-year contracts provided Ms. Maccagnan with a due process property interest in her continued employment as principal at High Plains. Because she failed to establish a protected property interest, we need not address whether she received adequate process. "Absent a property interest, there can be no violation of Due Process." *Washington*, 847 F.3d at 1202 (quotations omitted)). We affirm the district court's grant of summary judgment on this claim.

**2.  Equal Pay Act**

Ms. Maccagnan's EPA claim contends that Cherry Creek improperly adjusted her experience credit to pay her less than male administrators. The district court granted summary judgment to Defendants because (1) the pay disparity she alleged was "based on a factor other than sex," an affirmative defense under the EPA, and (2) Ms. Maccagnan failed to establish the justification was pretextual. *Maccagnan,* 2024

17

WL 6822017, at *20-21. Although the district court legally erred by requiring

Ms. Maccagnan to prove pretext, we nonetheless affirm because Defendants

established their affirmative defense.

### a.  Legal background

"The EPA prohibits wage discrimination 'between employees on the basis of

sex . . . for equal work on jobs the performance of which requires equal skill, effort,

and responsibility, and which are performed under similar working conditions.'"

*Riser v. QEP Energy*, 776 F.3d 1191, 1195 (10th Cir. 2015) (quoting 29 U.S.C.

§ 206(d)(1)). Because the EPA imposes "a form of strict liability on employers who

pay males more than females for performing the same work . . . , the plaintiff in an

EPA case need not prove that the employer acted with discriminatory intent."

*Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1310-11 (10th Cir. 2006). Instead,

EPA claims proceed in two steps.

First, the plaintiff must establish a prima facie case of pay discrimination by

demonstrating that "(1) she was performing work which was substantially equal to

that of the male employees considering the skills, duties, supervision, effort and

responsibilities of the jobs; (2) the conditions where the work was performed were

basically the same; (3) the male employees were paid more under such

circumstances." *Riser*, 776 F.3d at 1196 (quoting *Sprague v. Thorn Ams., Inc.*, 129

F.3d 1355, 1364 (10th Cir.1997)).

18

Second, "the defendant must show the pay disparity was justified by one of four permissible reasons: '(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.'" *Id.* at 1198 (quoting 29 U.S.C. § 206(d)(1)). To prevail at summary judgment, the employer must prove one of these reasons "so clearly that no rational jury could find to the contrary." *Mickelson*, 460 F.3d at 1311 (quotations omitted). To succeed on an affirmative defense, the employer must provide evidence "that the proffered reasons *do in fact* explain the wage disparity." *Id.* at 1312 (quotations omitted).

Although the defendant bears the ultimate burden of persuasion on the affirmative defense, a plaintiff may but is not required to point to evidence showing defendant's justification is a pretext, thereby raising a genuine dispute of material fact. *See Brownlee v. Gay & Taylor, Inc.*, 861 F.2d 1222, 1224 (10th Cir. 1988); *Hayes v. Clariant Plastics & Coatings USA, Inc.*, 144 F.4th 850, 865 n.11 (6th Cir. 2025).

#### b. Additional factual background

Cherry Creek set salary ranges for each administrative position. It determined a salary within each range based on criteria enumerated in the Administrator's Agreement, including experience. The Administrator's Agreement classified "Athletic Director, Activity Director, Assistant to Principal, [and] Assistant Principal" as relevant experience for salary determination. Aplt. App., Vol. 2 at 333.

19

Although not listed, Cherry Creek also credited experience as Principal, Dean, and Coordinator of Student Achievement ("COSA") as relevant.

In 2018, Cherry Creek hired Oehm Consulting, Inc. to conduct a market analysis of its salaries and provide recommendations. Cherry Creek provided Oehm with the names, positions, experience, salaries, and stipends of the administrators. It did not provide the administrators' gender. Oehm recommended a salary for each administrator based on their relevant experience.

Before Oehm's salary review, Ms. Maccagnan received credit for 16.5 years of experience: 7 years for Coordinator of Online Learning, 6 years for Assistant Principal, and 3.5 years as Principal (factoring in the current year). Oehm recommended adjusting Ms. Maccagnan's experience credit to 10.5 years because her Coordinator of Online Learning position did not fall within the credited relevant-experience categories. Based on the adjusted years of experience, Oehm recommended that Ms. Maccagnan's salary remain the same for the 2018-19 school year. Cherry Creek adopted Oehm's recommendation.

c.   *Additional procedural background*

The district court granted summary judgment to Defendants on Ms. Maccagnan's EPA claim. It was undisputed that she established a prima facie case at the first step: "all elementary school principals perform substantially equal work under similar circumstances" and "some male elementary school principals were paid a higher salary than Ms. Maccagnan." *Maccagnan*, 2024 WL 6822017, at

20

*20 (quotations omitted). At the second step, the court concluded the Defendants demonstrated that the pay disparity was justified by a "factor other than sex" because Cherry Creek determined salary ranges "based on the number of years of relevant administrative experience." *Id.* (quotations omitted).

After determining that Defendants "met their burden," *id.*, the district court analyzed whether Ms. Maccagnan showed that Defendants' proffered "experience-based justification . . . is pretext for gender discrimination," *id.* at *21. It said the "burden [was] on Ms. Maccagnan to establish this claim of pretext" and treated it as "an essential element of her Equal Pay Act claim." *Id.* Because she failed to provide evidence of pretext, the court granted summary judgment to Defendants. *Id.*

### d. Analysis

Ms. Maccagnan argues the district court applied the wrong legal standard to her EPA claim. Aplt. Br. at 25-28. She is partially correct. Although the court accurately identified the two-step framework for EPA claims, its pretext analysis strayed from those steps.

EPA claims consist of (1) the prima facie case and (2) the affirmative defenses. *Mickelson*, 460 F.3d at 1311; *Washington County v. Gunther*, 452 U.S. 161, 169 (1981). The district court added a third step. It treated pretext as "an essential element of [an] Equal Pay Act claim" that Ms. Maccagnan must prove. *Maccagnan*, 2024 WL 6822017, at *21. "A third step, assessing pretext, makes no sense in an EPA analysis because that statute, unlike Title VII, does not require proof

21

of intentional discrimination." *Baker v. Upson Reg'l Medical Ctr.*, 94 F.4th 1312, 1318 (11th Cir. 2024); *Mickelson*, 460 F.3d at 1310-11 (explaining the "significant distinction" between "a plaintiff's burden to prove discrimination" under Title VII and the EPA).

A plaintiff may produce pretext evidence to dispute an employer's affirmative defense but is not required to prove pretext to prevail. *See Brownlee*, 861 F.2d at 1224 (explaining plaintiff "could have rebutted the [employer's] EPA defenses by showing pretext"); *Hayes*, 144 F.4th at 865 n.11 ("Hayes need not show pretext to prevail on her EPA claim."). By requiring Ms. Maccagnan "establish [a] claim of pretext," *Maccagnan*, 2024 WL 6822017, at *21, the district court departed from the EPA's "form of strict liability," *Mickelson*, 460 F.3d at 1310-11, and improperly relieved Defendants of their burden under the EPA.

That said, reviewing the issue de novo and holding Defendants to their burden, we affirm summary judgment because no rational jury could disagree that Cherry Creek based Ms. Maccagnan's salary on a factor—relevant experience—other than sex. *See Mickelson*, 460 F.3d at 1312. Cherry Creek produced uncontested evidence that it computed salaries, including Ms. Maccagnan's, based on set salary ranges and years of relevant experience. Experience is a "factor other than sex" under the EPA. *Riser*, 776 F.3d at 1198 (quoting 29 U.S.C. § 206(d)(1)).[15]

---

[15] *See also Mickelson*, 460 F.3d at 1312 ("[A]n employee's prior experience is a factor 'other than sex' for purposes of the Equal Pay Act."); *Casalina v. Perry*, 708 F.

Ms. Maccagnan concedes the "District paid administrators based on their years of administrative work" but still argues factual disputes precluded summary judgment. Aplt. Br. at 27-28; Aplt. Reply Br. at 13-15. She contends that whether Cherry Creek accurately calculated her experience credit remained disputed. Aplt. Br.at 28. But any such dispute is not material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The material factual issue is whether the wage disparity was based on a "factor other than sex." Even if Oehm miscalculated Ms. Maccagnan's relevant experience, she agrees that Defendants determined her salary based on experience.

Ms. Maccagnan may attempt to show that Cherry Creek's relevant experience calculation was a pretextual justification. *See Brownlee*, 861 F.2d at 1224; *Angove v. Williams-Sonoma, Inc.*, 70 F. App'x 500, 508 (10th Cir. 2003) (unpublished) ("[E]xperience is an acceptable factor other than sex if not used as a pretext for differentiation because of gender." (quotations omitted)). She fails to do so. For pretext, she would need evidence that Cherry Creek's change to her experience credit, "whether wise or mistaken, wasn't honestly arrived at." *Roberts v. Int'l Bus. Machines Corp.*, 733 F.3d 1306, 1309 (10th Cir. 2013).

---

App'x 938, 941 (10th Cir. 2017) (unpublished) (affirming summary judgment for employer based on "'other than sex' affirmative defense" because male employee "had accumulated twenty-seven years of relevant experience compared to [female plaintiff's] sixteen years").

23

Ms. Maccagnan identifies no "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Cherry Creek's determination of her experience credit. *Riser*, 776 F.3d at 1200 (quotations omitted). Cherry Creek hired Oehm, a neutral, third-party consultant, to conduct a market analysis, and Oehm recommended reducing Ms. Maccagnan's experience credit because it was not relevant. Only particular positions qualified for relevant experience and Cherry Creek "did not give anyone else coordinator experience in 2018" after Oehm's market analysis. Aplt. App., Vol. 2 at 312. Ms. Maccagnan's disagreement with Cherry Creek about relevant experience does not show pretext or otherwise undermine Cherry Creek's affirmative defense. *See Iweha*, 121 F.4th at 1226 ("We do not ask whether the employer's reasons were wise, fair or correct." (quotations omitted)).

Because Cherry Creek's reliance on relevant experience justified the wage disparity, Defendants carried their burden on the affirmative defense. We affirm summary judgment on the EPA claim.

**3.    Section 1983 Equal Protection Claim**

Ms. Maccagnan appeals the summary judgment ruling for Cherry Creek on her equal protection claim based on disparate treatment,[16] arguing the district court "offer[ed] no explanation." Aplt. Br. at 29. This argument lacks merit. And because

---

[16] Ms. Maccagnan asserted other equal protection violations, specifically hostile work environment and unequal pay, but she does not challenge the district court's decision to grant summary judgment on those theories.

Ms. Maccagnan fails to address the district court's reasoning on the merits, we affirm.

a. *Legal background*

Section 1983 provides that a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."  42 U.S.C. § 1983.

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), "a municipality is a 'person' subject to § 1983 liability."  *Burke v. Regalado*, 935 F.3d 960, 998 (10th Cir. 2019) (quotations omitted).  As a local government entity, a school district may be subject to municipal liability.  *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1191 (10th Cir. 2020).  Municipal liability requires an underlying constitutional violation.  *Burke*, 935 F.3d at 998; *see also Donahue v. Wihongi*, 948 F.3d 1177, 1199 (10th Cir. 2020); *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006).  "[T]he plaintiff must [further] show: (1) a municipality enacted or maintained a policy, (2) the municipality was deliberately indifferent to the resulting constitutional violations, and (3) the policy caused the underlying constitutional violation."  *Arnold v. City of Olathe*, 35 F.4th 778, 795 (10th Cir. 2022).

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV,

25

§ 1. "It is 'essentially a direction that all persons similarly situated should be treated alike,' and 'keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.'" *Stepp*, 168 F.4th at 1305-06 (first quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); then quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). At summary judgment, a plaintiff may rely on direct evidence or the *McDonnell Douglas* burden-shifting framework to prove employment discrimination in violation of the Equal Protection Clause. *See, e.g.*, *Burns v. Bd. of Cnty. Comm'rs*, 330 F.3d 1275, 1283 (10th Cir. 2003); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991).[17]

   b.   *Additional procedural background*

   Ms. Maccagnan alleged that Defendants violated her equal protection rights by "demoting her without cause while men engaged in the same alleged misconduct were not demoted." Aplt. App., Vol. 1 at 47-48. She sought municipal liability for

---

[17] "While *McDonnell Douglas* involved a Title VII claim, its burden-shifting analysis applies equally to § 1983 claims of [sex] discrimination in violation of the Equal Protection Clause." *Burns*, 330 F.3d at 1283; *see also Salguero v. City of Clovis,* 366 F.3d 1168, 1175 (10th Cir. 2004) ("We evaluate the merits of both the §§ 1981 and 1983 claims pursuant to the stepwise allocation of burdens of proof set forth in *McDonnell Douglas* . . . ."); *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995) (holding "the City can be held liable for any impermissible employment decisions under §§ 1981 and 1983 pursuant to the *McDonnell Douglas* framework originally developed to determine the existence of intentional discrimination in violation of Title VII").

Cherry Creek and individual liability for Dr. Seigfried, Dr. Perry, Ms. Smith, and the Board members.[18]

     i.    <u>Summary judgment opinion</u>

Applying the burden-shifting *McDonnell Douglas* framework, the district court concluded Ms. Maccagnan "made a prima facie showing of disparate treatment on the basis of gender, i.e., the evidence shows that the District demoted only female administrators for the sole reason of losing the confidence of their staff." *Maccagnan*, 2024 WL 6822017, at *24. It then concluded Defendants failed to meet their burden of identifying "a legitimate, non-discriminatory reason for Ms. Maccagnan's demotion" and denied summary judgment. *Id.* It granted qualified immunity to the individual Board members, however, because "they were insufficiently knowledgeable of the facts tending to show disparate treatment" and individual liability under § 1983 requires personal involvement. *Id.*

In summarizing its rulings, the district court stated "the surviving claims are Claim 3 against Dr. Siegfried, Dr. Perry, and Brenda Smith for violations of the

---

    [18] As noted, Ms. Maccagnan sued the individual defendants in their individual and official capacities. The official-capacity claims are "treated as a suit against the entity." *Graham*, 473 U.S. at 166.

Equal Protection Clause of the Fourteenth Amendment only as it relates to Ms. Maccagnan's demotion . . . ." *Id.* at *27.[19]

### ii.   Disputed claim notice and pretrial conference

Shortly before trial, Defendants raised a dispute regarding the scope of Ms. Maccagnan's surviving equal-protection claim.  They believed the claim survived "against Smith, Perry, and Seigfried only," but Ms. Maccagnan believed her claim survived "against the District, as well as Smith, Perry, and Seigfried."  Aplt. App., Vol. 7 at 1530.  At the final pretrial conference, the district court said, "I'm reviewing my order and I have already ruled on this.  There is no equal protection claim against the district.  So my summary [of the surviving claims] is correct."  *Id.* at 1653.

### iii.   Interlocutory appeal order

Ms. Maccagnan promptly moved to certify the issue for interlocutory appeal under 28 U.S.C. § 1292(b).  The district court denied the motion and again clarified its summary judgment ruling.  *See Maccagnan v. Cherry Creek Sch. Dist. No. 5*, No. 22-cv-00503, 2025 WL 2051752, at *1 (D. Colo. July 21, 2025).  It said, "[U]nder the right circumstances, the [School] District could be found liable under an Equal Protection claim" but such liability requires "evidence of intentional gender-based

---

[19] The other surviving claim was "Claim 5 against the District and the Board for violations of Title IX only as that claim relates to Ms. Maccagnan's demotion and allegations of gender stereotyping." *Maccagnan*, 2024 WL 6822017, at *27.

discrimination by the School District in the form of an official custom or policy to discriminate." *Id.* at *2. It continued, "Ms. Maccagnan's Complaint (and her summary judgment briefing, for that matter) is completely devoid of any such allegation related to an official District custom or policy to discriminate, nor is there any evidence of such a custom or policy." *Id.*

c. *Analysis*

On appeal, Ms. Maccagnan challenges the district court's handling of Cherry Creek's summary judgment motion on her equal protection claim based on disparate treatment, arguing the court first denied summary judgment in its written opinion but then improperly granted it in a "turn-about" oral ruling during the final pretrial conference. Aplt. Br. at 28-29. Even accepting Ms. Maccagnan's description, it is not a basis for reversal.

A partial summary judgment ruling is an interlocutory order, not a final judgment, and the district court has "general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 n.2 (10th Cir. 2008) (quotations omitted); *see Anixter v. Home-Stake Prod. Co.*, 977 F.2d 1533, 1548 (10th Cir. 1992) ("[P]artial summary judgment of fewer than all of the claims or parties shall not terminate the action as to any of the claims or parties and may be revised at any time before final judgment is entered on all of the claims and parties." (quotations omitted)). Even if the district court changed its summary judgment ruling, as Ms. Maccagnan contends, it did not

29

commit error on the merits.  Ms. Maccagnan does not contend otherwise.  At most, she argues the district court insufficiently explained its reasoning in its oral ruling during the final pretrial conference.  Aplt. Br. at 29.[20]

Although the district court's summary judgment opinion and pretrial conference ruling may have lacked clarity, its order denying Ms. Maccagnan's request to file an interlocutory appeal did not.  "[A]ny error that may have been made by the trial court when it granted [the School District's] motion for partial summary judgment was cured by its subsequent 'clarification' of the ruling."  *U.S. Indus., Inc. v. Touche Ross & Co*. 854 F.2d 1223, 1249 (10th Cir. 1988), *overruled on other grounds by Cent. Bank of Denv., N.A. v. First Interstate Bank of Denv., N.A*., 511 U.S. 164 (1994).

We affirm the district court's summary judgment for Cherry Creek on the equal protection disparate treatment claim.

### B.  *Evidence Rulings*

Ms. Maccagnan proceeded to trial on her surviving § 1983 equal protection claim against Dr. Siegfried, Dr. Perry, and Ms. Smith, and her Title IX claim against

---

[20] Ms. Maccagnan belatedly argues in her reply brief that she presented sufficient evidence to raise a disputed issue of fact on municipal liability, contending the Board delegated responsibility for personnel matters to the Superintendent and, as the final policymaker, his decisions may give rise to municipal liability.  Aplt. Reply Br. at 11-12. Ms. Maccagnan "waived this argument by not raising it in her opening brief."  *Iweha*, 121 F.4th at 1232.

Cherry Creek.  She argues the district court erred in (1) excluding evidence about a similarly-situated male comparator Ryan Langdon and (2) admitting Dr. Roybal's notes from the staff meetings in March 2020.[21]  Neither ruling warrants reversal.

In assessing a district court's evidence rulings, "we review its legal interpretation of the Federal Rules of Evidence de novo and its application of the rules for abuse of discretion."  *United States v. Armajo*, 38 F.4th 80, 84 (10th Cir. 2022).  "A district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment."  *Burke*, 935 F.3d at 1011 (quotations omitted).

"When a district court has improperly admitted or excluded evidence, we reverse 'only if the error affects a substantial right of the party.'"  *Id.* (quoting Fed. R. Evid. 103(a)).  "An error affecting a substantial right of a party is an error which had a substantial influence or which leaves one in grave doubt as to whether it had such an effect on the outcome."  *McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1142 (10th Cir. 2006) (quotations omitted).

---

[21] In her opening brief, Ms. Maccagnan also argues the district court "erred in allowing evidence of two males who were not comparators" during Dr. Seigfried's testimony.  Aplt. Br. at 16.  But in her reply brief, Ms. Maccagnan abandons this challenge, stating that she does not "object[]" to the "introduction" of this evidence but "the *use* of that evidence by Judge Arguello to show a lack of discrimination."  Aplt. Reply Br. at 19.  Because Ms. Maccagnan has abandoned her challenge to the admission of the evidence, we do not address it.  *See United States v. Lewis*, 116 F.4th 1144, 1154 n.3 (10th Cir. 2024).

1. **Mr. Langdon Comparator Evidence**

To prove her equal protection and Title IX claims based on disparate treatment, Ms. Maccagnan sought to introduce testimony regarding Cherry Creek's treatment of Mr. Langdon, a male principal. Defendants objected on relevance grounds, arguing Mr. Langdon was not similarly situated. The district court sustained the objection and excluded the evidence. We agree that Ms. Maccagnan failed to show Mr. Langdon was similarly situated to her and thus see no reason to reverse.

a. *Legal background*

Equal protection and Title IX both provide recourse for "gender discrimination in schools." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009). As noted, the Equal Protection Clause prohibits differential treatment on the basis of sex. *See United States v. Virginia,* 518 U.S. 515, 532-34 (1996); *Stepp*, 168 F.4th at 1305-06. Title IX prohibits "employment discrimination [on the basis of sex] in federally funded educational programs." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017).[22] To prevail on either claim, the plaintiff must prove intentional discrimination. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005);

---

[22] Title IX makes it unlawful to discriminate on the basis of sex in education: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

*Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021).[23] The "plaintiff's sex

need only be a 'motivating factor' in the unlawful employment practice." *Throupe v.*

*Univ. of Denv.*, 988 F.3d 1243, 1251 (10th Cir. 2021).

   A plaintiff may prove intentional discrimination through direct evidence or

circumstantial evidence. *Ashaheed*, 7 F.4th at 1250; *U.S. Postal Serv. Bd. of*

*Governors v. Aikens*, 460 U.S. 711, 715 (1983).[24] Circumstantial evidence permitting

an inference of discrimination includes evidence "that the plaintiff was treated

differently from similarly situated persons who are 'alike in all relevant respects.'"

*Ashaheed*, 7 F.4th at 1250 (quoting *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th

Cir. 2018)). Such evidence presents a disparate-treatment theory of discrimination.

---

[23] The "substantive rights and protections guaranteed under Title IX and the Equal Protection Clause" overlap in some respects and "diverge" in others. *Fitzgerald*, 555 U.S. at 256. The standards for liability against municipalities are not "wholly congruent." *Id.* at 257. "[A] Title IX plaintiff can establish school district liability by showing that a single school administrator with authority to take corrective action responded to harassment with deliberate indifference" or discriminated on the basis of sex. *Id.* at 257. By contrast, "[a] plaintiff stating a similar claim via § 1983 for violation of the Equal Protection Clause by a school district or other municipal entity must show that the harassment [or discrimination] was the result of municipal custom, policy, or practice." *Id.* at 257-58 (citing *Monell*, 436 U.S. at 694).

[24] When a plaintiff relies on circumstantial evidence of discrimination at summary judgment, we apply the familiar three-step *McDonnell Douglas* burden shifting framework. *See, e.g.*, *Burns*, 330 F.3d at 1283 (Equal Protection); *Throupe*, 988 F.3d at 1251 (Title IX). At trial, the *McDonnell Douglas* framework "drops from the case" and the factfinder proceeds to the "ultimate factual issue in the case"— "whether the defendant intentionally discriminated against the plaintiff." *Aikens*, 460 U.S. at 715 (quotations omitted); *Barrett v. Salt Lake County*, 754 F.3d 864, 867 (10th Cir. 2014).

*Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) ("Disparate-treatment cases present the most easily understood type of discrimination and occur where an employer has treated [a] particular person less favorably than others because of a protected trait." (citations and quotations omitted)).  "In an employment discrimination case, evidence of disparate treatment is only relevant if the plaintiff can show that he or she was treated differently from other similarly-situated employees." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1116-17 (10th Cir. 2007) (quotations omitted); *see Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994).

"Employees are similarly situated when they share a supervisor or decision-maker, must follow the same standards, and engage in comparable conduct." *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021). Depending on the circumstances of the case, plaintiffs may rely on a shared direct supervisor, *see, e.g.*, *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1141 (10th Cir. 2024), a shared "decision maker," *Smothers v. Solvay Chems., Inc.,* 740 F.3d 530, 540 (10th Cir. 2014); *see also Lacaze v. Gourley*, No. 24-6075, 2025 WL 1216716, at *2 (10th Cir. Apr. 28, 2025) ("[A] a shared supervisor is not a comparator requirement; it is sufficient if the plaintiff and the comparator shared the same decision-maker."), or significant overlap between groups of supervisors and decision makers, *Smothers*, 740 F.3d at 541; *Ibrahim*, 994 F.3d at 1197.

A district court may exclude purported comparator evidence about other employees that is insufficient to support a similarly situated finding.  *See, e.g.*, *Curtis*

34

*v. Okla. City Pub. Schs. Bd. of Educ.*, 147 F.3d 1200, 1218 (10th Cir. 1998).[25]

Without a threshold showing that plaintiff and the alleged comparator are similarly situated, "the jury is not entitled to draw an inference of discrimination" from that evidence. *Riggs*, 497 F.3d at 1117.

### b.    Additional factual background

Mr. Langdon was a principal for Cherry Creek at Heritage Elementary School from approximately 2019 to 2023. Derek Mullner was his direct supervisor, and Dr. Perry was Mr. Mullner's supervisor. Dr. Seigfried was the Superintendent and Dr. Perry's supervisor until June 2021, when Christopher Smith replaced him.[26]

In May 2021, a CCEA Listening Tour reported concerns about Mr. Langdon, including lack of communication with staff, no support for staff, lack of empathy, a culture of fear/retaliation, and low staff morale. *See* Aplt. App., Vol. 5 at 1202-03. After the Listening Tour, Mr. Mullner met with Mr. Langdon and Heritage staff but

---

[25] *See Aman v. Dillon Cos., Inc.*, 645 F. App'x 719, 728 (10th Cir. 2016) (unpublished) (holding "[i]t was within the district court's discretion to conclude that none of these employees' misconduct was comparable to Aman's" and exclude evidence related to their treatment); *Burleson v. Sprint Pcs Grp.*, 123 F. App'x 957, 960 (10th Cir. 2005) (unpublished) (Because "Ms. Burleson did not demonstrate that the circumstances involving the other employees were similar to hers or otherwise tied to hers," "[w]e find no abuse of discretion in excluding this evidence."); *Gaige v. SAIA Motor Freight Line, LLC*, 672 F. App'x 787, 791 (10th Cir. 2016) (unpublished) (holding "district court acted within its discretion in excluding the testimony" by another employee based on "minimal relevance").

[26] Ms. Maccagnan named Brenda Smith as a defendant in her complaint. She did not sue Christopher Smith.

did not take any disciplinary action. Instead, Mr. Mullner provided "coaching" through "formal meetings, informal meetings, [and] conversations" to move forward and "guide conversations with teachers." Aplt. App., Vol. 4 at 911-12 (quotations omitted).

In April 2023, nearly two years after the Listening Tour, Mr. Mullner visited Heritage again and this time concluded that staff had lost confidence in Mr. Langdon. He then recommended to Dr. Perry that Mr. Langdon be demoted to assistant principal. She agreed. Later that month, Mr. Mullner, Dr. Perry, and Ms. Smith met with Mr. Langdon and informed him of the demotion.

   c.   *Additional procedural history*

       i.   Summary judgment

At summary judgment, Defendants argued that Ms. Maccagnan failed to establish disparate treatment. They pointed to evidence regarding Mr. Langdon to show they also demoted male principals for losing the confidence of their staff. The district court saw it differently, concluding that Ms. Maccagnan made a "prima facie showing of disparate treatment on the basis of gender." *Maccagnan*, 2024 WL 6822017, at *24. It said the summary judgment record showed that Mr. Langdon "was given two years of coaching and opportunities to improve before he was demoted" while "Ms. Maccagnan, on the other hand, was demoted less than six months after Dr. Roybal first became aware of concerns with her performance as Principal." *Id.*

ii. Trial

At the final pretrial conference, the district court informed Ms. Maccagnan that it would not allow "anecdotal evidence of alleged discrimination" unless the employees were "similarly situated." Aplt. App. Vol. 7 at 1691. The court defined similarly-situated employees as "those that share the same supervisor, are subject to the same standards, performance evaluation and discipline and engaged in the same conduct as the plaintiff." *Id.* at 1692. It further stated that "for that testimony to be relevant and not unduly prejudicial," the proposed comparator must "have been demoted for the same reasons" and "by the same supervisor." *Id.* at 1696.

At trial, when Ms. Maccagnan's counsel attempted to elicit testimony regarding Mr. Langdon, Defendants objected on relevance grounds. They argued that Mr. Langdon and Ms. Maccagnan did not share the same supervisor or decision-maker and therefore were not similarly situated. Ms. Maccagnan's counsel acknowledged that the immediate supervisors differed—Mr. Mullner for Mr. Langdon and Dr. Roybal for Ms. Maccagnan—but argued they had higher levels of supervision in common, namely Dr. Perry and Dr. Seigfried.

The district court sustained the objection, concluding Mr. Langdon was "not similarly situated." Aplt. App., Vol. 9 at 2115. It stated "the direct supervisor has to be the chain of command. So if the chain of command is not the same, then according to the case law, it's not similarly situated." *Id.* When Ms. Maccagnan attempted to introduce other comparators, the court reiterated that "to get information

37

of other comparators, they have to be similarly situated, which means, under the case law, they have to have the same supervisors. Unless you can lay that foundation that they had Diana Roybal, Ms. Perry and Ms. Smith, I guess, then they're not similarly situated." *Id.* at 2164-65.

### d. Analysis

Ms. Maccagnan argues the district court abused its discretion when it excluded testimony about Mr. Langdon. Aplt. Br. at 10. Although the court described our similarly-situated law too narrowly, it did not err in excluding the evidence.

The key to this issue is recognizing what constituted the disparate treatment of Ms. Maccagnan relative to Mr. Langdon. Both were demoted from principal to assistant principal for lack of staff confidence. They were treated differently after their respective Listening Tours. Although both received negative feedback in the tours, Mr. Langdon's direct supervisor, Mr. Mullner, gave him two years and coaching to improve staff relations. Ms. Maccagnan's direct supervisor, Dr. Roybal, recommended demotion after only four months.

This disparate treatment was relevant if Mr. Langdon and Ms. Maccagnan were similarly situated. But they were not. Different supervisors made the disparate-treatment decisions—Mr. Mullner decided how to treat Mr. Langdon and Dr. Roybal decided how to treat Ms. Maccagnan. And although Dr. Perry supervised both Mr. Mullner and Dr. Roybal, she was not involved in those decisions. *See* Aplt. App., Vol. 9 at 2155 (Dr. Perry testifying that it was not "[her] role at the time" to

38

support Ms. Maccagnan and "[t]o [her] knowledge, Diana [Roybal] was providing ongoing support.").  The Mr. Langdon comparator evidence was therefore properly excluded.  *See Smothers,* 740 F.3d at 540 ("Differences in disciplinary decisions may be explained by the fact that the discipline was administered by different supervisors." (quotations omitted)); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) ("Differences in treatment that are . . . explained by a nondiscriminatory motive will not sustain a claim of [disparate treatment.]").[27]

Ms. Maccagnan argues the district court erred in excluding the evidence because "the same school officials were primarily involved in the demotions for both Mr. Langdon and Ms. Maccagnan."  Aplt. Br. at 15.  She contends that the Board made the final demotion decision for both of them, *id.* at 13-14, and that the "[c]hain of [c]ommand" involved in both demotions substantially overlapped, *id.* at 15.  But these arguments view the disparate treatment too broadly and fail to recognize that Ms. Maccagnan and Mr. Langdon had different supervisors making the decisions leading to the only differential treatment they experienced.  Ms. Maccagnan

---

[27] *See Curtis*, 147 F.3d at 1217-18 (holding district court did not abuse its discretion in excluding comparator evidence on the basis of relevance because of "a number of dissimilarities between [employees] situations" including "a different supervisor who was not involved in this case"); *Burleson*, 123 F. App'x at 960 (concluding plaintiff "did not demonstrate that the circumstances involving the other employees were similar to hers").

identifies no evidence that shared higher ups in the chain of command or the Board directed their immediate supervisors' different responses to the Listening Tours.

Although not well-developed in her briefing, Ms. Maccagnan suggests the district court stated an unduly narrow view of the law on what constitutes similarly-situated employees. At the pretrial conference, the district court said the proposed comparator "must . . . have been demoted by the same supervisor." Aplt. App., Vol. 7 at 1696. And in excluding the comparator evidence, the court said Mr. Langdon was not similarly situated to Ms. Maccagnan because "the direct supervisor has to be the chain of command" and the "chain of command is not the same." Aplt. App., Vol. 9 at 2115. As explained above, our cases recognize that, depending on the circumstances, employees may be similarly situated if they have common decision-makers, including group decision-makers, and "absolute congruence" is not required for the latter. *Smothers*, 740 F.3d at 541.

But even if the district court's rule statements on what it takes to be similarly situated were overly restrictive, so long as "some legally correct theory" justifies the exclusion of the comparator evidence, "no error occurred." *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1247-48 (10th Cir. 2000) (quoting *United States v. Jackson*, 88 F.3d 845, 847 (10th Cir. 1996)). Requiring the same supervisor for admissibility here was not error because the direct supervisors were solely responsible for the differential treatment.

In sum, the Mr. Langdon comparator evidence was "only relevant" and probative of intentional discrimination if Ms. Maccagnan and Mr. Langdon were similarly situated. *Riggs*, 497 F.3d at 1117. They were not. We affirm the district court's exclusion of the evidence.

## 2. Dr. Roybal's Notes

Ms. Maccagnan moved in limine to exclude Dr. Roybal's notes from the March 2020 meetings with High Plains staff (1) as inadmissible hearsay under Federal Rules of Evidence 801(c) and 802, and (2) as unduly prejudicial under Rule 403. The district court denied the motion. Ms. Maccagnan renewed her objections at trial, which the court overruled, concluding the notes were admissible as non-hearsay for their effect on the listener's state of mind and not more prejudicial than probative. We see no abuse of discretion in the district court's rulings.

### a. *Legal background*

#### i. Hearsay

"'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). "Hearsay is not admissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court." Fed. R. Evid. 802 (formatting omitted).

But not all out-of-court statements are hearsay. "[A] statement offered to establish its effect on the listener is not hearsay." *United States v. Murry*, 31 F.4th 1274, 1292 (10th Cir. 2022). It is not offered for the truth of the matter asserted but to prove "the intent, knowledge, beliefs, motivation, or any other reaction of the person who heard it." *United States v. Martinez*, 122 F.4th 389, 414 (10th Cir. 2024). "[S]uch statements can explain 'why the listener acted as [they] did.'" *Id.* (quoting *United States v. Churn*, 800 F.3d 768, 776 (6th Cir. 2015)).

ii.   Unfair prejudice

Under Rule 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. We will not reverse a trial court's decision to admit evidence under Rule 403 absent a clear abuse of discretion. *Bond v. Sheriff of Ottawa Cnty.*, 173 F.4th 1265, 1300 (10th Cir. 2026); *see Old Chief v. United States*, 519 U.S. 172, 174 n.1 (1997). "Excluding evidence under Rule 403 is an extraordinary remedy to be used sparingly." *United States v. Parker-Miliorini Int'l LLC*, 79 F.4th 1262, 1275 (10th Cir. 2023). "Rule 403 does not protect a party from all prejudice, only unfair prejudice." *Id.* (quoting *Deters v. Equifax Credit Info. Servs.*, 202 F.3d 1262, 1274 (10th Cir. 2000)).

42

b.    *Additional factual background*

During her meetings at High Plains in March 2020, Dr. Roybal took notes reflecting staff comments.  The notes did not attribute any comments to specific persons.  They included 15 pages of mostly critical comments regarding poor communication, lack of trust, decision-making without teacher input, staff not feeling valued, lack of credibility, fear of retaliation, negativity, lack of accessibility, and a toxic environment.  *See* Aplt. App., Vol. 10 at 2517-30.

c.    *Additional procedural history*

During the final pretrial conference, the district court denied Ms. Maccagnan's motion to exclude Dr. Roybal's notes, concluding that "these notes are relevant and admissible for the effect on the listener" because "the inquiry conducted by Dr. Roybal led to defendants' decision to demote Ms. Maccagnan."  Aplt. App., Vol. 7 at 1661.  At trial, Defendants introduced the notes through Dr. Perry, who said she considered them before recommending the demotion.  Ms. Maccagnan renewed her objection, which the district court overruled.  The court said, "It's being offered for the effect on the listener and why they took the actions they took."  Aplt. App, Vol. 9 at 2182.  It also determined the evidence was "not more prejudicial than it is probative."  *Id.*

Defense counsel directed Dr. Perry to numerous comments throughout the notes and, for each comment, asked whether it gave Dr. Perry concern, why it concerned her, and how it affected her decision to recommend demotion.  Dr. Perry

43

explained how each comment created concerns about Ms. Maccagnan's ability to lead

the school.  For instance:

> Q. And then, look here, there is a lack of transparency. Did
> that give you concern?
>
> A. Yes.
>
> Q. Why?
>
> A. Transparency often impacts trust incredibly.  If people
> feel like you're not being truthful, open about why
> you're making decisions, why someone's position was
> changed or why something happened with a specific
> discipline event or what's being asked from the district
> or a myriad of things that happened, they often then
> lose trust, which is apparently what was being reported
> here.

*Id.* at 2187-88.

### d.    Analysis

Ms. Maccagnan challenges the district court's admission of Dr. Roybal's

notes, arguing they should have been excluded under the hearsay and unfair prejudice

rules.[28]  We disagree.

---

[28] For the first time on appeal, Ms. Maccagnan also challenges the notes as irrelevant under Rule 401.  Aplt. Br. at 17.  Because she failed to object on that basis in district court and did not argue plain error on appeal, she has forfeited and waived the argument.  *See* Fed. R. Evid. 103(a)(1) (To preserve a claim of "error in a ruling to admit or exclude evidence," a party must "timely object[]" and "state[] the specific ground, unless it was apparent from the context."); *United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) ("When an appellant fails to preserve an issue and also fails to make a plain-error argument on appeal, we ordinarily deem the issue waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise.").

In response to the hearsay objection, the district court admitted the notes, not for their truth, but for their effect on the Defendants' state of mind when deciding to demote Ms. Maccagnan. Dr. Perry explained how Dr. Roybal's notes influenced her decision. She testified that individual comments in isolation might not have prompted demotion, but the volume of negative feedback led to her recommendation. *See id.* at 2199-2202.

We have held that similar third-party statements were admissible as non-hearsay in employment discrimination cases to establish their effect on a decision-maker's state of mind. *See, e.g.*, *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1418, 1434 (10th Cir 1993) ("[T]estimony was offered to establish Super Valu's state of mind in making its hiring decisions and was not offered for the truth of the matter asserted.").[29] The district court properly admitted Dr. Roybal's notes for the same reason here.

Ms. Maccagnan's contention that the notes' prejudicial effect substantially outweighed any probative value under Rule 403 also fails. *See* Aplt. Br. at 18. The district court correctly determined that Dr. Roybal's notes were probative of the

---

[29] *Zamora v. Bd. of Educ. for Las Cruces Pub. Schs.*, 553 F. App'x 786, 790 (10th Cir. 2014) (unpublished) ("The report is not hearsay because the Board offered it to establish the effect it had on Superintendent Rounds' state of mind when he made the decision to terminate Zamora."); *Fester v. Farmer Bros. Co.*, 49 F. App'x 785, 789 (10th Cir. 2002) (unpublished) ("[R]eport was nonhearsay because it was being offered to establish Carson's state of mind in making the decision to discharge Fester and was not offered for the truth of the matter asserted.").

reason for Ms. Maccagnan's demotion—lack of staff confidence. Dr. Perry and Dr. Seigfried both considered and relied upon Dr. Roybal's notes when deciding to demote Ms. Maccagnan. *See Faulkner*, 3 F.3d at 1434.[30]

And because we do not have "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances" in its Rule 403 balancing analysis, *United States v. Call*, 129 F.3d 1402, 1405 (10th Cir. 1997) (quotations omitted), we discern no abuse of discretion in the district court's denial of Ms. Maccagnan's Rule 403 objection. The court thus did not abuse its discretion in admitting Dr. Roybal's notes.

## C.   *Judgment as a Matter of Law*

Ms. Maccagnan appeals the district court's decision to grant Defendants JMOL under Federal Rule of Civil Procedure 50(a). Based on the evidence admitted at trial, we affirm.

### 1.   Legal Background

"We review grants of judgment as a matter of law de novo, drawing all reasonable inferences in favor of the nonmoving party and applying the same

---

[30] *See also Dodoo v. Seagate Tech., Inc.*, 235 F.3d 522, 528-29 (10th Cir. 2000) (testimony regarding "the content of [plaintiff's] performance appraisals . . . was relevant to whether [plaintiff] was qualified for the positions"); *Godinet v. Mgmt. & Training Corp.*, 56 F. App'x 865, 872 (10th Cir. 2003) (unpublished) (holding "district court properly deemed [testimony regarding Plaintiff's abilities] relevant and found that prejudice did not outweigh probative value" in employment discrimination case).

standard as should be applied in the district court." *Eisenhour v. Weber County*, 897

F.3d 1272, 1280 (10th Cir. 2018) (brackets and quotations omitted). Under Rule

50(a)(1), a court may grant a JMOL after "a party has been fully heard on an issue

during a jury trial and the court finds that a reasonable jury would not have a legally

sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P.

50(a)(1).

"Judgment as a matter of law is appropriate only if the evidence points but one

way and is susceptible to no reasonable inferences which may support the nonmoving

party's position." *Burke*, 935 F.3d at 991 (quoting *Elm Ridge Expl. Co. v. Engle*, 721

F.3d 1199, 1216 (10th Cir. 2013)). "[W]e review the elements of the claim or

defense at issue and discuss whether the nonmovant has satisfied those elements such

that submission to a jury was required." *Bay v. Anadarko E&P Onshore LLC*, 912

F.3d 1249, 1255 (10th Cir. 2018). "We do not judge witness credibility." *Id.*

(quotations omitted).

**2. Additional Procedural Background**

In addition to evidence previously summarized, the following evidence was

presented at trial.

*a. Other demotions*

Christie Toliver, a female employee, testified that, after a CCEA Listening

Tour, Cherry Creek transferred her from principal to assistant principal for loss of

staff confidence. Dr. Seigfried confirmed Ms. Toliver's demotion and testified that

47

two other male principals were also demoted for "loss of confidence of staff and performance issues" and were "not offered a contract to return in any position." Aplt. App., Vol. 9 at 2111-12, 2125, 2127.

### b. Stereotyping

Ms. Maccagnan testified about comments she had received from unspecified sources and from the Listening Tour, asserting they were sex or gender stereotypes.[31]

On direct examination, she gave "examples" of "being told how to behave," "that I had to be more nurturing, that I had to be more visible, that I had to be -- that I had to check in with staff and be more caring." Aplt. App., Vol. 8 at 1835-36. She did not identify who "told" her those things. *Id.*

Ms. Maccagnan also introduced the Listening Tour written summary into evidence but did not quote from it. Instead, she testified, seemingly from memory, that the summary described her as "power wielding and micromanager and

---

[31] Courts have recognized that "sex" and "gender" are not necessarily the same but have used them interchangeably in cases alleging discrimination based on stereotypes. *See, e.g., Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 107 & n.2 (2d Cir. 2018) ("This opinion assumes *arguendo* that 'sex' in Title VII means biologically male or female and uses the terms 'sex' and 'gender' interchangeably" in addressing a stereotyping claim. (citations and quotations omitted)); *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 346 (7th Cir. 2017) ("For present purposes, we have no need to decide whether discrimination on the basis of 'gender' is for legal purposes the same as discrimination on the basis of 'sex,' which is the statutory term. Many courts, including the Supreme Court, appear to have used 'sex' and 'gender' synonymously."); *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000) (discussing distinctions between sex and gender but concluding "the terms 'sex' and 'gender' have become interchangeable" under Title VII).

48

directive." *Id*. at 1836.  The summary itself does not include the term "power wielding" (or anything similar) but does include "Diction/directives" and "Micro-management" as staff concerns.  Aplt. App., Vol. 10 at 2463.

On cross examination, she reiterated that describing her as "intimidating, power wielding, direct, harsh, noncollaborative, lacking in empathy and not being warm" showed stereotyping because those "behaviors are what describe a successful male."  Aplt. App., Vol. 8 at 1904-05.  But again, she did not identify who described her in that manner, though the Listening Tour written summary includes "[l]ack of collaboration," no effort "to build stronger and warmer relationships with the staff," and a recommendation to be "more empathetic with staff."  Aplt. App., Vol. 10 at 2463-64.  It does not include "intimidating," "power wielding," "harsh," or anything like those phrases.  *Compare* Aplt. App., Vol. 8 at 1904-05 *with* Aplt. App., Vol. 10 at 2463-64.

Also on cross, defense counsel directed Ms. Maccagnan to comments in the Listening Tour summary that she had identified as gender stereotyping in her deposition.  She said the comments "lack of relationship with the principal," "lack of communication," "[lack of] inclusivety [sic] on staff meetings," and "[not] supporting staff" are gender stereotyping because they "implied judgment" and "the idea that women are supposed to be caretakers [and] kind."  Aplt. App., Vol. 8 at 1901-04; *see also* Aplt. App., Vol. 10 at 2463.

49

Anette Couch, a former colleague, briefly testified that Ms. Maccagnan did not conform to gender stereotypes because she was "smart" and "a data person," not "emotional" or "a feeler." Aplt. App., Vol. 9 at 2015-16.

Defendants disputed the gender stereotype testimony. Dr. Perry disagreed that "being smart is a stereotype of what men are, not women," *id.* at 2179, said that criticizing communication skills is not gender stereotyping because "everybody needs to be able to communicate," *id.* at 2185, and stated that "loss of confidence" is not "gender specific" because trust is important for any principal to lead a school. *Id.* at 2209-10. In general, she disagreed that the Listening Tour report reflected gender stereotyping. Dr. Seigfried testified that the qualities for a successful principal are the same for "men and women"—"Somebody that works well with people, communicates well, builds trust." *Id.* at 2124.

### c.    Demotion decision

Both Dr. Seigfried and Dr. Perry testified that they did not consider Ms. Maccagnan's gender in the demotion decision. Dr. Perry testified that she recommended the demotion based on a "plethora of information," including parent complaints, grievances, the Listening Tour, and Dr. Roybal's notes, *id.* at 2149, which "play[ed] a significant factor in [her] decision to recommend demotion," *id.* at 2209. Ultimately, she determined the staff did not trust Ms. Maccagnan "and they weren't going to be able to move forward with her." *Id.*

50

Dr. Seigfried considered Dr. Perry's recommendation and the same underlying information. He concluded Ms. Maccagnan had lost the staff's confidence. He demoted her because "[y]ou're unable to lead a school anymore if you don't have the trust of the staff." *Id.* at 2099-100.

### 3. Analysis

Ms. Maccagnan appeals the JMOL ruling on both theories presented at trial: disparate treatment on her equal protection and Title IX claims and sex stereotyping on her Title IX claim. We reject her arguments and affirm.

#### a. *Disparate treatment*[32]

Ms. Maccagnan sought to prove disparate treatment with evidence that Cherry Creek treated her worse than similarly-situated male employees. Her arguments on appeal misunderstand the scope of our review. She relies on evidence not admitted at trial, specifically, the Mr. Langdon comparator evidence. She argues the district court's "evidentiary errors led directly" to the Rule 50 ruling because excluding the Mr. Langdon evidence prevented her from proving differential treatment. Aplt. Br. at 20-21. This argument fails.

A district court's consideration of a Rule 50 JMOL motion and our review of the court's ruling are both limited to the evidence admitted at trial. As the Supreme

---

[32] The legal background relevant to Ms. Maccagnan's disparate-treatment theory is presented above in the discussion of the Mr. Langdon comparator evidence. *See supra* II.B.1.a.

51

Court explained, "The filing of a post-trial motion under Rule 50 allows the district court to take first crack at the question that the appellate court will ultimately face: Was there sufficient evidence *in the trial record* to support the jury's verdict?" *Dupree*, 598 U.S. at 735.[33]  We therefore cannot consider Ms. Maccagnan's evidence regarding Mr. Langdon that was excluded at trial even though it was part of the summary judgment record.  *Aman*, 645 F. App'x at 727 n.4 (declining to consider "evidence from the summary judgment record" in reviewing district court's JMOL ruling).  And we held above it was properly excluded at trial.  She seems to concede that, absent such evidence, she failed to prove her case.  Aplt. Reply Br. at 25 (stating that the exclusion "prevented Ms. Maccagnan from being able to show that there was a similarly-situated man who was treated differently, allowing the District Court to erroneously rule that Ms. Maccagnan had not proven disparate treatment").[34]

Ms. Maccagnan presented no evidence that she was treated less favorably than similarly-situated individuals.  The trial evidence included:

---

[33] *McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1037 (9th Cir. 2003) ("Evidence not admitted at trial cannot be used in a review of the district court's denial of judgment as a matter of law."); 9B Wright & Miller's Federal Practice & Procedure § 2540 (3d ed. 2026) ("When reviewing a district court's grant or failure to grant judgment as a matter of law, a court of appeals only may consider evidence that was admitted at trial.").

[34] *See also* Aplt. Br. at 21 ("Absent Judge Arguello's rulings regarding comparators, Ms. Maccagnan could have presented enough evidence for a reasonable jury to conclude that the District's stated reasons for her demotion were pretextual."); *id.* ("Had Ms. Maccagnan been able to present evidence that a direct comparator was treated differently; Judge Arguello could not have found that Ms. Maccagnan failed to show discriminatory intent.").

- Dr. Seigfried demoted Ms. Maccagnan from principal to assistant principal because the Listening Tour showed loss of staff confidence and staff interviews revealed largely negative feedback.

- Cherry Creek demoted a similarly-situated, female principal to assistant principal because a Listening Tour showed loss of staff confidence and staff interviews revealed negative feedback.

- Cherry Creek demoted two male principals for loss of confidence and other performance issues. The men were not offered contracts to return in any position the following school year.

Drawing all reasonable inferences in Ms. Maccagnan's favor, the evidence demonstrated that a similarly-situated female (Ms. Toliver) was treated the same as her and that two male principals who were not similarly situated were treated the same (or worse) than her. The evidence failed to raise a jury issue on disparate treatment.

Ms. Toliver's similar treatment does not suggest disparate treatment absent evidence that individuals not in her and Ms. Maccagnan's protected class were treated better. And, as Ms. Maccagnan herself argues on appeal, Aplt. Br. at 15-16, the male principals were not appropriate comparators. Comparators must have "violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1232. Unlike the two males, Ms. Maccagnan's demotion did not involve any disciplinary issues or misconduct. The male principals had additional performance or misconduct issues that Ms. Maccagnan did not have.

Regardless, the trial evidence showed Cherry Creek treated the male principals in the same or worse manner than Ms. Maccagnan. They were demoted and, unlike

53

Ms. Maccagnan, "not offered a contract to return in any position." Aplt. App., Vol. 9 at 2127. The same or worse treatment does not show intentional discrimination. *Bostock v. Clayton County*, 590 U.S. 644, 657 (2020) ("To discriminate against a person, then, would seem to mean treating that individual worse than others who are similarly situated." (quotations omitted)); *Sampson v. Integra Telecom Holdings, Inc.*, 461 F. App'x 670, 674 (10th Cir. 2012) (unpublished) (holding plaintiff "has not shown he was subject to disparate treatment" where employees with conduct "similar to or worse than [plaintiff]" were also terminated).

In sum, the trial evidence was insufficient for a reasonable jury to find in Ms. Maccagnan's favor on disparate treatment. We therefore affirm JMOL on Ms. Maccagnan's § 1983 equal protection and Title IX claims based on disparate treatment in her demotion.

b. *Stereotyping*

Ms. Maccagnan argues the district court erred in granting JMOL on her sex-stereotyping Title IX claim because no evidence rebutted her testimony regarding stereotypes. Aplt. Br. at 22-23. The record shows otherwise. Dr. Perry and Dr. Seigfried provided contrary testimony to Ms. Maccagnan's statements on sex stereotypes. In any event, Ms. Maccagnan's evidence fell short of requiring submission to the jury.

54

       i.    <u>Legal background</u>

In *Price Waterhouse v. Hopkins*, 490 U.S 228 (1989),[35] the Supreme Court recognized that Title VII's prohibition of discrimination "because of . . . sex" encompasses discrimination based on sex stereotypes. *Id.* at 251 (quotations omitted). Price Waterhouse denied a partnership to the plaintiff, a senior manager, in part for being "macho." 490 U.S. at 235. To "improve her chances for partnership," she was told to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* The Court plurality said sex stereotyping comments in an employee's evaluations, which the employer "relied very heavily on . . . in making its [promotion] decision," supported liability for sex discrimination. *Id.* at 256.[36] But it clarified that "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular

---

[35] *Superseded in part by* 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B). *See Comcast Corp. v. Nat'l Assoc. of African American-Owned Media*, 589 U.S. 327, 337 (2020) (explaining Congress "displaced" *Price Waterhouse*'s burden-shifting approach to causation "in favor of its own version of the motivating factor test" in the Civil Rights Act of 1991). Our analysis does not rely on the superseded portion of *Price Waterhouse*.

[36] Six justices agreed that the stereotyping comments supported a sex discrimination claim. 490 U.S. at 250-51 (plurality of four), 258-61 (White, J., concurring), 272-73 (O'Connor, J., concurring). *See Marks v. United States*, 430 U.S. 188, 193 (1977) (When there is no majority rationale, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (quotations omitted)).

employment decision." *Id.* at 251.  Rather, "[t]he plaintiff must show that the employer actually relied on her gender in making its decision." *Id.*

Relying on *Price Waterhouse* in a Title IX case, we held a plaintiff may prove intentional discrimination with "evidence that the [employment action] was motivated by [a] failure to conform to stereotypical gender norms." *Throupe*, 988 F.3d at 1251-52 (quotations omitted).  Every circuit has reached the same conclusion in Title VII or Title IX cases or both.[37]  The plaintiff must show that (1) stereotypes (2) were relied on in the employment action.[38]  *See Morales-Cruz v. Univ. of Puerto Rico*, 676 F.3d 220, 225 (1st Cir. 2012) (requiring "a reasonable inference of adverse

---

[37] Title VII:  *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 59 (1st Cir. 1999); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 44-45 (2d Cir. 2000); *Bibby v. Phila Coca Cola Bottling Co.*, 260 F.3d 257, 262-64 (3d Cir. 2001); *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 120 (4th Cir. 2021); *E.E.O.C. v. Boh Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 454 (5th Cir. 2013); *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004); *Hively*, 853 F.3d at 346 (7th Cir.); *Lewis v. Heartland Inns of Am., LLC*, 591 F.3d 1033, 1038-39 (8th Cir. 2010); *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874-75 (9th Cir. 2001); *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *Hopkins v. Price Waterhouse,* 920 F.2d 967, 969 (D.C. Cir. 1990).

Title IX:  *Weinstock,* 224 F.3d at 42 n.1, 44-45 (2d Cir.); *Chisolm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 351 (6th Cir. 2020); *A.C. ex rel M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1117 (9th Cir. 2023); *C.W. ex rel. Doe v. Smith*, --- F.4th ----, 2026 WL 1745411, at *3 (11th Cir. 2026).

[38] As one commentator put it, "[A] court confronted with an allegation that a stereotyped comment or belief evinces discrimination 'because of' sex must address two primary questions":  (1) "is a stereotype even in play"; and (2) whether "a sufficient nexus may be said to exist between the stereotype and the adverse action at issue."  Kerri Lynn Stone, *Clarifying Stereotyping*, 59 U. Kan. L. Rev. 591, 634 (2011).

action based on a gender stereotype"); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 44

(2d Cir. 2000) (considering whether "qualities . . . are stereotypically female" and

whether the terms were "used during her tenure process").[39]  Courts have defined a

sex stereotype as "a belief that a person is not acting as [their sex] should act."

*Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1117 (9th Cir. 2023) (quotations

omitted); *see Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (defining a

stereotype as "failing to act and appear according to expectations defined by

gender").

     ii.   <u>Analysis</u>

     a)   No or minimal evidence of stereotypes

Ms. Maccagnan's sex stereotyping evidence was minimal at best.  It consisted

of comments from (1) unknown sources (2) and the Listening Tour.  As for the

former, even assuming the words 'power wielding,' 'intimidating,' 'harsh,' and

'nurturing' reflect sex stereotypes, they do not appear in the Listening Tour's written

summary and Ms. Maccagnan identified no other source for those purported

comments.  *Compare* Aplt. App., Vol. 8 at 1835-37, 1904-05 (Ms. Maccagnan's

---

[39] *See also Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017) (recognizing a Title VII cause of action "when an adverse action is taken because of an employee's failure to conform to sex stereotypes"); *E.E.O.C. v. R.G. & G.R. Funeral Homes*, 884 F.3d 560, 574 (6th Cir. 2018) (granting summary judgment "[b]ecause the EEOC has presented unrefuted evidence that unlawful sex stereotyping was at least a motivating factor in the [employer's] actions").

testimony) *with* Aplt. App., Vol. 10 at 2463-64 (Listening Tour summary).  Without

any evidence of who made those comments and in what context, Ms. Maccagnan's

testimony about them has little or no probative value.  And no reasonable jury could

find Defendants knew about, much less relied on, such language in making the

demotion decision.  *See Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213-14

(10th Cir. 2022) (Because plaintiff "could not describe the timing or contexts in

which [her supervisor] made derogatory comments . . . , no connection exists

between these comments and the adverse employment action.").

As for comments in the Listening Tour summary such as "[l]ack of

collaboration," "[m]icro-management," and "[l]ack of communication," Aplt. App.,

Vol. 10 at 2463-64, this terminology is plainly "gender-neutral on its face and will

not, without more, support an inference of discriminatory intent." *Adamson v. Multi

Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1151 (10th Cir. 2008).  At trial,

Ms. Maccagnan asserted that these words are sex stereotypes because they

"describe[] a successful male" and women "are supposed to be caretakers, kind."

Aplt. App., Vol. 8 at 1904, 1906.  But a plaintiff must provide more than her own

conclusory belief that words connote stereotyping.  *See Adamson*, 514 F.3d at 1151

("Without more, . . . an employee's subjective belief in a comment's invidious nature

also does not support an inference of discriminatory intent.").[40]  On appeal, she offers

---

[40] *See Morales-Cruz*, 676 F.3d at 225 ("[T]he supposed stereotype of which the
plaintiff complains is not one that, by common knowledge or widely shared perception, is

no cases or other support to corroborate her subjective belief. *See Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1049 (10th Cir. 2020) (relying on law review articles and scientific studies to support a claim of sex stereotyping).

Ms. Maccagnan thus has not shown these are sex-based terms. *See Morales*, 676 F.3d at 225 (holding "'immature,' 'unable to handle complex and sensitive issues,' engaged in 'twisting the truth,' and exhibiting 'lack of judgment' . . . are without exception gender-neutral" and thus "insufficient to anchor a gender-stereotyping claim"); *Thomas v. Farmers Ins. Exch.*, 856 F. App'x 176, 187-88 (10th Cir. 2021) (unpublished) (holding term "alpha[]" used as contrast to male applicant lacking leadership qualities "does not constitute direct evidence of discrimination" based on sex stereotyping).

The Listening Tour summary also included comments that Ms. Maccagnan should "be more empathetic" and "build stronger and warmer relationships." Aplt. App., Vol. 10 at 2463-64. Surely empathy and warmth are positive traits for any elementary school principal. *See Weinstock*, 224 F.3d at 45 ("Niceness and nurturing are not, after all, bad qualities to have in a teacher's mentoring capacity—particularly of undergraduates."). Even assuming that these comments reflect sex stereotypes, Ms. Maccagnan is left with only minimal evidence, a far cry from the profoundly

---

understood to be attributable to women."); *Weinstock*, 224 F.3d at 44-45 ("It is simply not objectively reasonable to label these innocuous words as semaphores for discrimination.").

59

sexist language in *Price Waterhouse*. "[T]he rule that stray remarks, without more, cannot ground a cause of action applies with equal force in the gender-stereotyping context." *Morales-Cruz*, 676 F.3d at 226. And as we discuss next, her claim ultimately fails because a reasonable jury could not find the Defendants relied on sex.

> b) No reliance on stereotypes

Even if a few isolated Listening Tour words could be construed as stereotypes, Ms. Maccagnan needed to "demonstrate a nexus exists between these allegedly discriminatory statements and [Defendants'] decision to [demote] her." *Cone*, 14 F.3d at 531. The trial record lacks such evidence.

First, Cherry Creek did not invite or gather the comments in the Listening Tour. High Plains staff requested the tour, and CCEA, not the School District, conducted it. The individuals making the comments did not decide, and indeed lacked authority, to demote Ms. Maccagnan. Generally, "[sex]-related comments by non-decisionmakers are not material." *See id.*

Second, there was no indication that the Listening Tour summary was "an important part" of the demotion decision. *See Price Waterhouse*, 490 U.S. at 251. Indeed, Dr. Seigfried testified that he "would not take employment action based on [a Listening Tour] alone," Aplt. App., Vol. 9 at 2093, explaining that any such action would depend on "what other data is available and what else we are able to collect." *Id.* For Ms. Maccagnan, that included Dr. Roybal's notes, parent complaints, and grievances. Dr. Perry also testified that it only became "evident" that

Ms. Maccagnan had lost the confidence of her staff when Dr. Roybal spoke to staff, three months after the Listening Tour. *Id.* at 2141, 2143.

Third, Dr. Seigfried and Dr. Perry both disclaimed any reliance on gender in deciding to demote Ms. Maccagnan. They testified Ms. Maccagnan was demoted for loss of confidence of staff. Even though they considered the Listening Tour summary, the vast majority of its comments lacked any indicia of sex stereotypes, and neither of them relied on the few comments that could arguably be considered gendered. Instead, they explained loss of confidence occurs when the staff lacks trust and will not follow the principal. Both testified that trust is particularly important for a principal to lead the school, and Cherry Creek demoted both men and women for loss of confidence. Requiring principals of all genders to maintain their staff's trust does not reflect sex stereotyping. *See Throupe*, 988 F.3d at 1254 (holding plaintiff failed to state a sex stereotyping Title IX claim where "[t]he only stereotyping defendants appear to have engaged in is about how *any* professor should interact with his or her students . . .")

Ms. Maccagnan thus failed to introduce evidence connecting the "stray remarks" in the Listening Tour to her demotion. *Price Waterhouse*, 490 U.S. at 251 (plurality).[41] In contrast, Defendants introduced significant evidence that a legitimate reason—loss of staff confidence—led to their decision.

---

[41] *See also Cone*, 14 F.3d at 531 (holding comments by chief executive officer and personnel director that older employees "were terminated because the hospital 'needs

\* \* \* \*

The district court correctly determined "that a reasonable jury would not have a legally sufficient basis to find for" Ms. Maccagnan on her sex stereotyping theory. Fed. R. Civ. P. 50(a). Defendants were thus entitled to JMOL. As the Supreme Court said in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), "An employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." 530 U.S. at 148.

### III. CONCLUSION

We affirm the district court's judgment.

---

some new young blood'" and "long-term employees have a diminishing return" "are best characterized as stray remarks" and "insufficient to create a jury issue in an ADEA case" (quotations omitted)); *Cuenca v. Univ. of Kansas*, 101 F. App'x 782, 788 n.3 (10th Cir. 2004) (unpublished) (affirming summary judgment because the plaintiff "failed to show that the University of Kansas's decisionmakers relied on the statements about race in [the] evaluation in reaching their decision").